UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| PAMELA SMITH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 12 C 9388 |
| v. | ) | |
| | ) | Judge Sara L. Ellis |
| PATRICK R. DONAHOE, | ) | |
| U.S. Postmaster General, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Plaintiff Pamela Smith, who is white, brings this action for employment discrimination against U.S. Postmaster General Patrick R. Donahoe. Ms. Smith contends that two of her supervisors at the United States Postal Service (the "USPS" or "Postal Service") terminated her employment because of her race. The Postal Service asserts that it dismissed Ms. Smith as a result of her repeated unscheduled absences from work, even after several warnings and suspensions, and two violations of a "last chance settlement agreement." Ms. Smith counters that two African American employees—Charlanda Johnson and Terry Towner—received more favorable treatment than she did despite their own histories of poor attendance. The Court grants the Postal Service's motion for summary judgment [45] because Ms. Smith has not made a *prima facie* case that she was similarly situated to or treated worse than Ms. Johnson or Mr. Towner and because Ms. Smith has not demonstrated that the Postal Service's reason for firing her was pretext.

# BACKGROUND[1]

## I. The Postal Service's Progressive Discipline Policy

Employees at the Postal Service's Fox Valley Processing & Distribution Center are subject to a progressive discipline policy. An attendance control officer monitors the attendance records of approximately 100 employees that work on each shift. Any leave that is not scheduled or approved in advance is considered "unscheduled leave." Calling in sick, arriving late, and taking unscheduled time off to care for a sick family member constitute unscheduled leave for the purposes of disciplining the employee. The progressive discipline policy sets out that employees with attendance issues are first called in for an official discussion in which they are shown their leave record. Prior to issuing any discipline, an attendance control officer meets with the employee and the union steward to discuss the reasons for the employee's absences. If an employee's attendance does not improve, the employee will receive a letter of warning. Employees who continue to incur unscheduled leave receive suspensions of seven or fourteen days. The final step in the disciplinary path is dismissal.

While the attendance control officer makes disciplinary decisions, his or her manager must approve all disciplinary actions. A "step two" designee in the Postal Service's labor department also reviews all proposed disciplinary action. An employee who receives a notice of removal can file a grievance with the union. The attendance control officer considers the grievance at step one. If the attendance control officer upholds the dismissal, the employee and the union may proceed to plead the employee's case to the step two designee. If the step two designee upholds dismissal, the grievance goes to the district level ("outside the building") and a national union representative takes over. Doc. 47 ¶ 11. An employee can also request that the

---

[1] The facts set forth in this section are derived from the joint statement of undisputed material facts [47]. They are taken in the light most favorable to Ms. Smith, the non-movant.

plant manager review the notice of removal and may seek to have the removal rescinded or converted to a last chance settlement agreement.

**II.     Smith's Employment with the USPS**

Ms. Smith worked as a clerk and mail handler for the USPS at the Fox Valley Processing & Distribution Center beginning in September of 2005.  Throughout her employment with the USPS, Ms. Smith failed to maintain reliable attendance.  She received letters warning that her attendance was unacceptable in February of 2006 and again in September of 2006.  She was required to attend pre-disciplinary interviews in November of 2006 and February of 2007.  Ms. Smith continued along the disciplinary path when she was suspended for seven days in February of 2007 and again in May of 2007.  In September of 2007, Ms. Smith was again informed that her attendance was not acceptable, to which she responded that she was having domestic problems.  Ms. Smith's youngest daughter has congenital heart disease and was on breathing machines and heart monitors for the first three or four years of her life.  Ms. Smith also stated that her ex-boyfriend stalked her, causing her to miss work.

In November of 2007, Karan Anderson, an African American attendance control officer with the USPS, issued Ms. Smith another letter of warning.  This letter explained that Ms. Smith had incurred 119.12 hours of unscheduled absences between June and October of 2007.  In March of 2008, Ms. Smith was suspended for seven days as a result of incurring 112.59 hours of unscheduled leave between November of 2007 and February of 2008.  Ms. Smith does not allege that Ms. Anderson was racially motivated in disciplining her.

In October of 2009, Athena Whitman, an African American attendance control officer, suspended Ms. Smith for seven days as a result of Ms. Smith incurring 64 hours of unscheduled absences in August and September of 2009.  Two months later, Ms. Whitman suspended Ms.

Smith for fourteen days after Ms. Smith accumulated 48.15 hours of unscheduled leave in November of 2009. In May of 2010, Ms. Whitman and her supervisor Quintin Mayberry, an African American, notified Ms. Smith that she would be removed from her position as a result of her repeated absences. The notice of dismissal stated that Ms. Smith incurred 168.34 hours of unscheduled absences from March through May of 2010. Ms. Smith does not allege that Ms. Whitman or Mr. Mayberry acted with discriminatory intent in disciplining her.

Ms. Smith disputed the May 2010 notice of removal, contending that she had missed work because of a back injury that she incurred on the job. The USPS offered Ms. Smith a "last chance settlement agreement" in June of 2010. This agreement reduced Ms. Smith's discipline from termination to a fourteen-day suspension. In exchange, Ms. Smith agreed that she would not have "more than three (3) unscheduled absences during **any** rolling six (6) month period or any instances of AWOL for two (2) years from the date of the signing of the agreement." Doc. 48-11 at 1. The agreement stated that if Ms. Smith violated any of the terms of the agreement she "will be removed from the Postal Service." *Id.* at 2.

In September of 2010, Ms. Smith received a second notice of removal, this one from night shift attendance control officer Shauna Sims and Ms. Sims' manager, Sammie Fuller. Both Sims and Fuller are African American. The notice stated that Ms. Smith had five instances of unscheduled leave from July through September of 2010, totaling 120.09 hours, in violation of her last chance settlement agreement. Ms. Smith does not allege that either Sims or Fuller acted with discriminatory intent. The union filed a grievance on behalf of Ms. Smith, after which time the removal was reduced to a long term suspension with no back pay. Ms. Smith was ordered to return to work in December of 2010. The letter also stated that the terms of the previous last chance settlement agreement remained in effect.

4

In April of 2011, Ms. Smith began working the evening shift, which the USPS calls "tour three." Doc. 47 ¶ 2. Anne Gilmore, who is African American, served as the attendance control officer on tour three. Ms. Smith was absent from July 15 through July 19, 2011. Upon returning to the office, Ms. Smith claims that Ms. Gilmore commented: "Girl, who do you think you are coming to work looking like a Barbie Doll trying to gain the attention of all our good, black men?" Doc. 48-1 at 25:7–8. A week after this incident, Ms. Smith informed the Postal Service that she had injured her back at work and would be off work until September of 2011.

Ms. Gilmore reviewed Ms. Smith's attendance record and consulted with three attendance control supervisors who were familiar with Ms. Smith's employment history. Ms. Gilmore concluded that Ms. Smith's July 2011 absences put her in breach of the last chance settlement agreement. Ms. Gilmore informed Ms. Smith in October of 2011 that she would be removed from her position. The notice of dismissal stated that Ms. Smith missed a total of 85.95 hours of work in four separate occasions between February and July of 2011. Specifically, the letter states that Ms. Smith missed 16 hours of work on February 19 and 20, 29.85 hours from June 4 through June 7, 0.1 hours on June 10, and 40 hours from July 15 through July 19, 2011. Ms. Smith concedes that she had unscheduled absences on February 19 and 20, June 10, and July 15 through 19, 2011.

In October of 2011, Ms. Smith wrote a letter to plant manager Matt Perri, who is white, requesting an opportunity to discuss her discharge. Ms. Smith and Mr. Perri discussed the issue over the phone in November of 2011. At this stage in the process, Mr. Perri had sole discretion to overturn Ms. Smith's dismissal. Because he did not see any procedural deficiencies or inaccuracies in Ms. Smith's attendance record and because he did not believe that Ms. Smith's attendance would improve, Mr. Perri upheld Ms. Smith's dismissal. Mr. Perri did not meet Ms.

5

Smith until February of 2012. At the time of their telephone call, Mr. Perri was not aware of Ms. Smith's race. Ms. Smith filed a timely formal complaint of race discrimination with the USPS that parallels the allegations of the Complaint in this case.

## III. Comparators

Ms. Smith has principally identified two African American USPS employees, Charlanda Johnson and Terry Towner, whom she claims were similarly situated to her and were treated more favorably as a result of their race. Ms. Johnson worked as a clerk on tour three beginning in May of 2000. As a result of attendance violations, Ms. Gilmore issued Ms. Johnson a letter of warning, a seven-day suspension, and a fourteen-day suspension. In June of 2010, Ms. Johnson received a notice of removal, which was reduced to a last chance settlement agreement containing substantially identical terms as those in Ms. Smith's last chance agreement. Ms. Johnson incurred four additional unscheduled absences in the form of tardy arrivals, totaling 1.69 hours of missed work, resulting in another notice of removal. Jacqueline Majka, the step three designee, recommended to Mr. Perri that administrative issues warranted granting Ms. Johnson a second last chance settlement agreement. This agreement reduced Ms. Johnson's removal to a long term suspension without back pay and imposed another 18 month probationary period in which Ms. Johnson could not have more than three unscheduled absences or any AWOLs.

Mr. Towner began working as mail handler on tour three in September of 2005. As a result of poor attendance, Mr. Towner had received a letter of warning, a seven-day suspension, and a fourteen-day suspension. Mr. Towner's personnel records depict that he also received a notice of removal in December of 2009. However, Mr. Towner was allowed to continue working with the USPS. The record does not reveal whether Mr. Towner signed a last chance settlement agreement related to the December of 2009 notice. It is clear that Mr. Towner entered

6

a last chance settlement agreement—perhaps his second—in November of 2010. Mr. Towner received another notice of removal in June of 2011, for violating his last chance settlement agreement by incurring 24.38 hours of missed work. But because three of Mr. Towner's unscheduled absences resulted from punching out early, which Mr. Perri viewed as a "gray area," Mr. Perri felt that dismissal was not warranted. Doc. 48-2 at 93:18. Therefore, Mr. Perri issued another last chance settlement agreement in July of 2011. At the time of this decision, Mr. Perri had never met or spoken to Mr. Towner.

## LEGAL STANDARD

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. To determine whether a genuine issue of fact exists, the Court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed. R. Civ. P. 56 & advisory committee's notes. The party seeking summary judgment bears the initial burden of proving that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). In response, the non-moving party cannot rest on pleadings alone but must use the evidentiary tools listed above to identify specific material facts that demonstrate a genuine issue for trial. *Id.* at 324; *Insolia v. Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), the Court must construe all facts in a light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

ANALYSIS

A plaintiff may bring an employment discrimination claim using either direct or indirect evidence of discrimination. *Nichols v. S. Ill. Univ.-Edwardsville*, 510 F.3d 772, 779 (7th Cir. 2007). Ms. Smith brings this action under the indirect method of proof. Doc. 54 at 7. Ordinarily, to establish a *prima facie* case of discrimination via indirect evidence, a plaintiff must show that: "1) she is a member of a protected class; 2) she was meeting her employer's legitimate performance expectations; 3) she suffered an adverse employment action; and 4) other similarly situated employees who were not members of the protected class were treated more favorably." *Fane v. Locke Reynolds, LLP*, 480 F.3d 534, 538 (7th Cir. 2007). Where, as here, a white employee brings a claim for race discrimination, a plaintiff may satisfy the first element by demonstrating that "background circumstances" suggest that "'the defendant is one of those unusual employers who discriminates against the majority.'" *Mills v. Health Care Serv. Corp.*, 171 F.3d 450, 455 (7th Cir. 1999) (quoting *Taken v. Okla. Corp. Comm'n*, 125 F.3d 1366, 1369 (10th Cir. 1997)). Once the plaintiff has satisfied the four elements of a *prima facie* case, the employer must identify a legitimate, non-discriminatory explanation for its action against the plaintiff. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). After the employer does so, "the burden shifts back to the plaintiff, who must present evidence that the stated reason is 'pretext,' which in turn permits an inference of unlawful discrimination." *Coleman v. Donahoe*, 667 F.3d 835, 845 (7th Cir. 2012).

Relying on *Peele v. Country Mutual Insurance Co.*, 288 F.3d 319, 329 (7th Cir. 2002), Ms. Smith contends that the second and fourth elements of a *prima facie* claim merge. In *Peele*, the Seventh Circuit stated:

> [w]hen a plaintiff produces evidence sufficient to raise an inference that an employer applied its legitimate employment expectations in a disparate manner

> (i.e., applied expectations to similarly situated [African American] employees in a more favorable manner), the second and fourth prongs of *McDonnell Douglas* merge—allowing the plaintiff to establish a *prima facie* case, stave off summary judgment for the time being, and proceed to the pretext inquiry.

*Peele*, 288 F.3d at 329. Therefore, Ms. Smith contends that the Court should view the Postal Service's reasonable expectations solely in light of the way they treated other employees with attendance issues. Ms. Smith alleges that Ms. Gilmore and Mr. Perri treated her worse than they treated her African American counterparts, Ms. Johnson and Mr. Towner. The Court finds that Ms. Smith fails to demonstrate that she was treated worse than any similarly situated colleague and also fails to demonstrate that the Postal Service's rationale for dismissing her was pretext.

## I. Similarly Situated Employees

The Court finds that Ms. Smith has not satisfied her burden to demonstrate that she was treated worse than similarly situated colleagues. First, the Court finds that Ms. Smith was not similarly situated to Ms. Johnson or Mr. Towner. To demonstrate that a fellow employee is similarly situated, Ms. Smith must show that she and her comparators "dealt with the same supervisor, were subject to the same standards, *and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them.*" *Weber v. Univ. Research Ass'n, Inc.*, 621 F.3d 589, 594 (7th Cir. 2010) (quoting *Peele*, 288 F.3d at 330). Ms. Smith and her comparators must be similarly situated "*in all respects.*" *Spath v. Hayes Wheels Int'l-Ind., Inc.*, 211 F.3d 392, 397 (7th Cir. 2000) (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)). To determine whether two people are similarly situated, the Court considers "'whether a prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated.'" *Perkins v. Brigham & Women's Hosp.*, 78 F.3d 747, 751 (1st Cir. 1996) (quoting *Dartmouth Review v. Dartmouth Coll.*, 889 F.3d 13, 19 (1st Cir. 1989)). Ms. Smith contends that she was similarly

9

situated to Ms. Johnson and Mr. Towner because they all had attendance problems. The Court disagrees.

The record reveals that Ms. Smith's attendance was significantly worse than the comparators she has identified. Specifically, Ms. Smith received a letter of warning regarding poor attendance—the first of three she received—just five months after she began working for the USPS. Ms. Smith was also suspended for seven days on four separate occasions and received an additional fourteen-day suspension in December of 2009. Ms. Smith received notices of removal in May and September of 2010.[2] Ms. Smith does not contend that any of this discipline was racially motivated. In contrast, Ms. Johnson and Mr. Towner each received only one letter of warning, one seven-day suspension, and one fourteen-day suspension prior to receiving a last chance settlement agreement.

Ms. Smith also ignores the difference between the amount of time she and her comparators missed from work in violating their last chance settlement agreements. Ms. Johnson violated her first last chance settlement agreement by missing only 1.69 hours of work. And Mr. Towner violated his last chance settlement after he missed 24.38 hours of work. Ms. Smith, on the other hand, was dismissed after incurring 85.95 hours of unscheduled absences over a six month period.

In short, Ms. Smith's attendance history was significantly worse than Ms. Johnson's or Mr. Towner's. The Court finds this to be a differentiating circumstance rendering Ms. Smith not similarly situated to her colleagues and justifying the USPS's decision to treat them differently by offering Ms. Johnson and Mr. Towner a second or a third last chance settlement agreement.

---

[2] Additionally, Ms. Smith's unscheduled absences were not merely a result of her arriving late or clocking out early. Rather, she accumulated significant totals of missed work: 119.12 hours over a four month span in 2007, 112.59 hours during a four month stretch from 2007 to 2008, 64 hours over two months in 2009, 168.34 hours during a three month span in 2010, and another 120.09 over three months in 2010.

*Weber*, 621 F.3d at 594. Courts will find that a plaintiff is not similarly situated to her comparators where the plaintiff's conduct or performance was significantly worse. *Kaniff v. Allstate Ins. Co.*, 121 F.3d 258, 265 (7th Cir. 1997) (plaintiff was not similarly situated to an employee who had engaged in fewer and less severe instances of misconduct); *Renta v. County of Cook*, No. 05 C 2995, 2011 WL 249501, at *4 (N.D. Ill. Jan. 26, 2011) (plaintiff was not similarly situated to employee who was less abrasive and more professional in the workplace); *Kutka v. DMC Auto Transfer of Chi., Inc.*, No. 00 C 7578, 2003 WL 21542479, at *5 (N.D. Ill. July 3, 2003) (plaintiff was not similarly situated to employees with better performance evaluations); *Ahern v. Universal Underwriters, Inc.*, No. 98 C 7328, 2000 WL 875407, at *4 (N.D. Ill. June 26, 2000) (plaintiff was not similarly situated to an employee who had a better sales record); *Williams v. Gen. Mills, Inc.*, 926 F. Supp. 1367, 1377 (N.D. Ill. 1996) (plaintiff was not similarly situated to employees who had engaged in fewer instances of sexual harassment).

Moreover, the Court finds that Ms. Smith has not demonstrated that she was treated less favorably than Ms. Johnson or Mr. Towner. Ms. Smith contends that she should have been given a second last chance settlement agreement, like Ms. Johnson and Mr. Towner. But Ms. Smith ignores that she violated her last chance settlement agreement twice prior to her termination and received a total of three notices of dismissal. After receiving one notice of dismissal and having it reduced to a last chance settlement agreement, Ms. Smith violated the agreement, but received only a long term suspension rather than dismissal. In reducing the punishment from dismissal, the USPS clarified that the prior last chance settlement agreement still applied. Thus, Ms. Smith did receive a second "last chance" when her September 2010 removal was reduced to a

suspension. It was only when Ms. Smith violated her last chance settlement agreement a second time that she was actually removed from her position.

Ms. Gilmore dismissed Ms. Johnson and denied her grievance at step one. Ms. Johnson only received a second last chance settlement agreement when the step three designee—whom Ms. Smith does not accuse of discrimination—decided that administrative issues warranted against dismissal. As for Mr. Towner, Ms. Gilmore issued the notice of dismissal and denied his grievance at step one. Because Mr. Towner incurred three of his five unscheduled absences when he clocked out early, which Mr. Perri testified was a "gray area," Mr. Perri provided him with another last chance settlement agreement. Doc. 48-2 at 93:18. Mr. Perri testified, and Ms. Smith does not controvert, that no administrative issues or "gray areas" were present in Ms. Smith's case. Doc. 47 ¶ 42.

Additionally, the joint statement of undisputed facts reveals that Mr. Perri did not even know Ms. Smith's race at the time of their telephone conversation in November of 2011. *Id.* at ¶ 43. Nor did Mr. Perri ever meet or speak to Mr. Towner. *Id.* at ¶ 59. Ms. Smith therefore cannot satisfy her burden of showing that Mr. Perri acted with discriminatory intent in treating her unfavorably. *Day v. Des Plaines Sch. Dist. 62*, No. 08 C 6147, 2011 WL 3555798, at *4 (N.D. Ill. Aug. 11, 2011) (granting summary judgment for the employer on a race discrimination suit where the defendant was not aware of the plaintiff's race). Ms. Smith contends that even though Mr. Perri was not aware of her race, the USPS is liable for Ms. Gilmore's actions under the cat's paw theory. *See Cook v. IPC Int'l Corp.*, 673 F.3d 625, 628 (7th Cir. 2012) ("In employment discrimination law the 'cat's paw' metaphor refers to a situation in which an employee is fired or subjected to some other adverse employment action by a supervisor who himself has no discriminatory motive, but who has been manipulated by a subordinate who does

have such a motive and intended to bring about the adverse employment action."). However, the cat's paw theory fails, and the chain of causation breaks, where an "unbiased decisionmaker conducts a meaningful and independent investigation of the information being supplied by the biased employee." *Schandelmeier-Bartels v. Chi. Park Dist.*, 634 F.3d 372, 383 (7th Cir. 2011).

Here, the evidence shows that Mr. Perri performed exactly such an independent investigation, by reviewing Ms. Smith's employment record and speaking directly with Ms. Smith on the telephone to hear her perspective. At the end of this inquiry, Mr. Perri determined that he saw nothing procedurally wrong with Ms. Smith's dismissal and that he did not believe that her attendance would improve. Additionally, Ms. Gilmore's supervisor, Mr. Fuller, and a step three designee also reviewed Ms. Smith's case and upheld her dismissal after Ms. Gilmore's allegedly biased actions. Because these reviews break the causal chain, Ms. Smith's cat's paw theory fails. *Martino v. MCI Commc'ns Servs., Inc.*, 574 F.3d 447, 453 (7th Cir. 2009) ("This is a particularly weak cat's paw case because, even if we assume Gross was prejudiced, there were not one but *two* layers of bias-free analysis."). Ms. Smith has not demonstrated that she was treated worse than any similarly situated colleagues and therefore she fails to make a *prima facie* case for racial discrimination.

## II.  Pretext

Moreover, the Court finds that Ms. Smith has not satisfied her burden to demonstrate that Postal Service's legitimate reason for dismissal was pretext. Although under the burden shifting analysis the question of pretext arises only after the plaintiff raises a *prima facie* case of discrimination, the Court may grant summary judgment in favor of the defendant based on finding that the employer's action was not pretextual. *Keeton v. Morningstar, Inc.*, 667 F.3d 877, 885 (7th Cir. 2012); *Bodenstab v. County of Cook*, 569 F.3d 651, 657 (7th Cir. 2009). To

13

demonstrate that the Postal Service's rationale for terminating her employment was pretext, Ms. Smith would have to "identify such weaknesses, implausibilities, inconsistencies, or contradictions in [the Postal Service's] proffered reasons that a reasonable person could find them unworthy of credence and hence infer that [the Postal Service] did not act for the asserted non-discriminatory reasons." *Boumehdi v. Plastag Holdings, LLC,* 489 F.3d 781, 792 (7th Cir. 2007). Ms. Smith can achieve this by demonstrating that the Postal Service's rationale for dismissing her: "(1) had no basis in fact; (2) did not actually motivate the adverse employment action; or (3) was insufficient to motivate the action." *Bates v. City of Chi.*, 726 F.3d 951, 956 (7th Cir. 2013). "The focus of a pretext inquiry is whether the employer's stated reason was honest, not whether it was accurate, wise, or well-considered." *Stewart v. Henderson,* 207 F.3d 374, 378 (7th Cir. 2000).

In her response, Ms. Smith does not directly respond to the Postal Service's rationale for dismissing her. But the Seventh Circuit has explained that "sometimes the analysis of the 'legitimate expectations' inquiry merges with the pretext analysis." *Smiley v. Columbia Coll. Chi.*, 714 F.3d 998, 1002 (7th Cir. 2013); *see also Cung Hnin v. TOA (USA), LLC*, --- F.3d ----, 2014 WL 1758457, at *5 n.1 (7th Cir. May 5, 2014) ("Under the circumstances, our analysis of [the employer's] legitimate job expectations merges with our pretext analysis."). Therefore, the Court will consider Ms. Smith's contention regarding the Postal Service's attendance expectations as an argument that the Postal Service's stated rationale was pretext.

The Court finds that Ms. Smith has not demonstrated that the Postal Service's rationale for dismissing her was pretext. Put another way, the Court finds that Ms. Smith did not meet the Postal Service's reasonable attendance expectations because she consistently violated the Postal Service's attendance policy. Ms. Smith contends that the USPS "affords excessive absenteeism"

14

and that she therefore comported with the Postal Service's attendance expectations. Doc. 54 at 10. But the USPS applies a system of progressive discipline, including warnings, suspensions, and dismissals with various levels of review and appeal. The best example of this system is Ms. Smith's own disciplinary history, which indicates that the Postal Service did, in fact, have certain expectations regarding an employee's attendance, and that Ms. Smith did not meet those expectations.

Ms. Smith cannot contend that she satisfied the Postal Service's expectations when, prior to her ultimate allegedly discriminatory removal, she had already received three written warnings, five suspensions, and two notices of dismissal that were reduced to additional suspensions. *See Williams v. Airborne Exp., Inc.*, 521 F.3d 765, 768 (7th Cir. 2008) (plaintiff could not show that he was meeting his employer's expectations when he had previously been suspended three times); *Dickerson v. Bd. of Trustees of Cmty. Coll. Dist. No. 522*, 657 F.3d 595, 602 (7th Cir. 2011) (plaintiff failed to demonstrate that he was meeting his employer's expectations when he had been warned that his job performance was not satisfactory); *Brown v. Chi. Sun-Times, Inc.*, No. 00 C 6728, 2002 WL 31844984, at *4 (N.D. Ill. Dec. 17, 2002) (plaintiff was not satisfying her employer's expectations when she received three written warnings prior to her dismissal). Ms. Smith does not contend that any of the warnings or suspensions she received were motivated by a discriminatory purpose. As the Seventh Circuit has stated, "[f]ailure to arrive for work on time—or at all—is not satisfactory performance. Employers need to know who will work so that they can plan production schedules (or arrange for substitutes)." *Lewis v. Caterpillar Inc.*, 367 F. App'x 683, 685 (7th Cir. 2010). The Court is sympathetic to Ms. Smith's stated reasons for incurring so many absences, but Ms. Smith has not demonstrated that she met the Postal Service's expectations such that the Court could infer that

the USPS discriminated against her based on race. Therefore, Ms. Smith has not shown that she met the Postal Service's attendance expectations or that the Postal Service's rationale for dismissing her was pretextual.

## CONCLUSION

For the reasons outlined above, the Postmaster General's motion for summary judgment [45] is granted. Judgment is entered in favor of Patrick R. Donahoe, the Postmaster General. This case is terminated.

Dated: May 29, 2014

_____
SARA L. ELLIS
United States District Judge